

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURIE A. WELDON,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 10 C 6326<br>)<br>) Judge John W. Darrah<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Laurie Weldon, has moved for summary judgment, seeking reversal or remand of the Social Security Administration ("SSA") Commissioner's final decision denying Weldon's claim for Disability Insurance Benefits ("DIB"). Defendant, SSA Commissioner Michael Astrue ("Commissioner"), has filed a cross-motion for summary judgment, requesting that the Court affirm his final decision.

### BACKGROUND

Weldon filed an application for DIB on January 10, 2007. The claim was denied at the initial and reconsideration levels. The Administrative Law Judge ("ALJ") held administrative hearings on March 2, 2009, and July 17, 2009. The ALJ denied Weldon benefits on November 18, 2009, in a written opinion (the "Opinion"). Weldon submitted a request for review; and the Appeals Counsel denied the appeal on August 14, 2010. Weldon filed the instant action on October 4, 2010.

The following facts, which are taken from Weldon's brief, are recited to provide context.

*Plaintiff's Background*

Weldon alleges disability based upon epilepsy, depression, comprehension, memory loss, and confusion. Weldon worked as a sales associate from 1994 through 1997; a caretaker from 1997 through 1998; and a health information clerk from November 1998 through April 2003. Weldon alleges an onset of disability on September 15, 2006.

Weldon reports that she began having seizures in March 1989. Weldon has been under the care of a neurologist, Dr. Susan Sicotte, since 1999. On August 31, 1999, Weldon underwent EEG testing, the results of which were "abnormal and demonstrated the presence of a focal abnormality in the right front temporal region." Dr. Sicotte examined Weldon on November 15, 1999, and assessed a partial complex seizure disorder, consistent with the findings of the EEG. On January 15, 2003, Dr. Sicotte reported to Weldon's primary-care physician that Sicotte had: "Complex partial seizure — intractable despite good levels of medications." Sometime in 2003, Weldon underwent a neuropsychological evaluation based on her complaints of memory loss and trouble concentrating.

Upon Dr. Sicotte's referral, Weldon underwent a craniotomy for correction of her epilepsy in December 2003 at the University of Chicago. Weldon returned to Dr. Sicotte for treatment on October 5, 2005, and reported that she had gone 13 months without seizures following her surgery but that she started having seizures again in January 2005.

Dr. Sicotte noted that Weldon had an increased frequency of seizures in the past year following an excellent response to epilepsy surgery. At this appointment, Dr. Sicotte increased Weldon's medication.

Weldon saw a primary-care physician, Dr. Marie Brown, in the fall of 2005. Dr. Brown reported that she was having one to two seizures per month. Dr. Brown also reported that Weldon would "binge" drink on Saturdays, drinking five drinks. On May 10, 2006, Dr. Brown diagnosed Weldon with complex partial seizures. At this time, Weldon reports that she had memory loss and trouble concentrating.

Dr. Sicotte furnished a report on March 16, 2007, in which she stated that 13 months after Weldon's surgery, her seizures returned and Weldon "does continue to have seizures on a monthly basis often catamenial and often occurring frequently during one week a month." Dr. Sicotte completed an additional report on December 7, 2007, in which she stated that Weldon had temporal lobe epilepsy with "intractable seizures and cognitive dysfunction." Dr. Sicotte noted the increase in seizures in 2005, which was coupled with memory loss. Dr. Sicotte stated that Weldon would suffer from drowsiness, disorientation, and confusion for two to three hours after a seizure. Dr. Sicotte checked the box labeled "No" in response to the question of whether the "patient engaged in malingering or symptom magnification" and described Weldon's compliance with her medication regimen as "excellent."

Dr. Sicotte continued to treat Weldon through the dates of the SSA hearings. In reports dated January 22, 2009 and February 22, 2009, Sicotte stated that Weldon's seizures were "intractable." Specifically in the 2/22/09 report, Dr. Sicotte stated:

"Ms. Weldon has intractable epilepsy and has been tried on multiple medications without ever achieving complete success .... Currently her seizure control is moderate. She has anywhere between 2-10 seizures a month and sometimes more with intermittent small seizures called auras."

*Hearing and ALJ Opinion*

At the SSA hearings, Weldon testified that when she experiences seizures, she rubs her stomach with her hand and tries to talk but is unable to. Weldon's seizures last 1 to 2 minutes at a time, and it takes Weldon approximately 30 minutes to recover from each seizure. Weldon also testified that her seizures were preceded by 30-second auras. Weldon testified that she frequently suffers from auras, and the occurrence of an aura does not necessarily mean a seizure will follow.

At the SSA hearings, the following experts testified: Dr. James McKenna (internal medicine); Kathleen O'Brien (psychologist); and GleeAnn Kehr (vocational). Dr. McKenna testified that Weldon has "controlled" seizures and ultimately concluded that Weldon did not meet the criteria in any of the Listings of Impairments. Furthermore, Dr. McKenna "explained that, unlike the claimant's treating neurologist, he did not credit the claimant's more current reports of frequent uncontrolled seizures." (Op. at 6.)

Dr. O'Brien testified that Weldon should avoid jobs which require visual memory. And at the very least, Weldon could perform simple tasks. Kehr testified that based on the medical experts' opinions, Weldon had the capacity for work at the unskilled and semi-skilled levels.

In his Opinion denying Weldon's claims for DIB, the ALJ concluded: "I am not convinced, more likely than not, [Weldon] has experienced that frequency of seizures; that when she experiences such seizures she has been compliant with prescribed treatment, and *inter alia*, not abused psychoactive substances; and that she has experienced that alleged frequency of seizures throughout the period at issue." (Op. at 14.)

## LEGAL STANDARD

An ALJ's decision becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). Section 405(g) of the Social Security Act grants federal courts the authority to review the Commissioner's final decision and enter a judgment, affirming, modifying, or reversing the decision, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g). The scope of judicial review is quite limited; this Court will affirm the ALJ's decision as long as it is supported by substantial evidence in the record and no error of law occurred. *Id.*; *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). Substantial evidence means "more than a mere scintilla"; it is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (*Young*).

In determining whether substantial evidence supports the ALJ's decision, the Court will review the entire administrative record but will not reweigh evidence, reevaluate facts, make decisions of credibility, resolve conflicts in the evidence, or substitute its judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.

5

2000) (*Clifford*). Although the district court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The district court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young*, 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## ANALYSIS

The determination of whether a claimant suffers from a disability as defined in the Social Security Act is conducted through a five-step inquiry, evaluated in sequence: (1) whether the claimant is engaged in substantial gainful activity, i.e. is employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner as conclusively disabling (*see* 20 C.F.R. § 404, Subpt. P, App. (the "Listings")); (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing work in the national economy. 20 C.F.R. § 404.1520; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). The claimant has the burden of proof for steps one through four; the Commissioner has the burden of proof for step five. *Clifford*, 227 F.3d at 868.

Before the Court is the narrow issue set out in (3) above: whether the ALJ properly found that Weldon did not meet the criteria of Impairment Listing § 11.02 or § 11.03. In order to meet her burden of proof, Weldon must establish, with objective

medical evidence, all the criteria specified in the Listing. *See* 20 C.F.R. §§ 404.1525, 404.1526. Section 11.02 of the Listings pertains to individuals who have "convulsive epilepsy" and requires claimants to prove they have seizures more than once a month. Weldon, however, suffers from "nonconvulsive," "petit mal" seizures. Therefore, her impairment is evaluated under Listing § 11.03, which pertains to "nonconvulsive" epilepsy. Listing § 11.03 requires:

> Epilepsy - nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03 (italics omitted).

Here, the ALJ held, "Either implicitly or explicitly, all of the medical opinions of record on this issue are in accord: the claimant's established physical impairments have not met or equaled the criteria of any of the Listings of Impairment." (Op. at 6.) Weldon argues that the ALJ failed to accord sufficient weight to the opinion of her treating neurologist, Dr. Sicotte.

In forming his opinion, the ALJ discounted Dr. Sicotte's opinion and instead gave controlling weight to the internal medicine expert, Dr. James McKenna. For example, the ALJ held, "I find the opinions of the medical experts to be the most informed, consistent with the medical evidence of record, convincing, and consistent with the record as a whole." Further, the ALJ stated, "[Dr. McKenna] explained that, unlike the

claimant's treating neurologist, he did not credit the claimant's more current reports of frequent uncontrolled seizures." (*Id.*)

Dr. Sicotte, who has been treating Weldon since 1999, was discounted by the ALJ because her reports were based "upon an absence of objective findings and reports by the claimant." (*Id.* at 7.) However, a treating physician's opinion about the nature and severity of the claimant's impairment is normally given controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is consistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). As the Seventh Circuit has held: "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (*Moss*); 20 CFR § 404.1527(d).

On several occasions, Dr. Sicotte opined that Weldon's seizures were "intractable" and specifically stated, in one report, that Weldon has "been tried on multiple medications without ever achieving complete success." Although the ALJ stated that "at first blush, the most convincing medical opinions of record were provided by . . . Dr. Sicotte," he proceeded to discount her opinion because it was based on Weldon's self-reporting. In this respect, the ALJ appears to have overlooked Dr. Sicotte's 12/7/07 report, in which she stated that Weldon was not engaging in malingering or symptom magnification. Moreover, Dr. Sicotte, Weldon's treating neurologist, recommended

Weldon for brain surgery and then, for at least five years post-surgery, repeatedly modified Weldon's seizure medication regimen in an attempt to control her seizures.

Furthermore, the ALJ stated, "Given the history of intractable seizures since calendar year 1999, the remarkably normal clinical and laboratory findings on examination in calendar year 2005 and thereafter are unexplained." (Op. at 6.) Dr. Sicotte's treatment notes did classify Weldon's seizures as "intractable" even after 2005 when her seizures returned. But if the ALJ believed that the return of Weldon's seizures was "unexplained," the ALJ had a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable. 20 C.F.R. § 404.1527(c)(3); *see also* S.S.R. 96-2p at 4. In this regard, Dr. McKenna testified at length that he was "confused by the[] medical record . . and [didn't] think there's enough medical evidence to clarify the situation in the file." (7/17/09 Hr'g Tr. at 7.) Specifically, Dr. McKenna was confused by the 13-month lull in seizures before they resumed, stating: "I feel the file is not sufficient or adequate. Because there's no reason why she should go from controlled situation after she's got over the surgery for several years and be quite well, and then all of a sudden be completely uncontrolled." (*Id.* at 9.) Here, the ALJ should have contacted Dr. Sicotte for clarification regarding the post-2005 seizures. *Cf. Smith v. Apfel*, 231 F.3d 433, 437-38 (7th Cir. 2000) (finding that the ALJ had a duty to develop the record, including soliciting updated medical records, when the ALJ did not afford the treating doctor's opinion controlling weight on that basis).

Moreover, the ALJ did not consider many of the factors set forth in 20 CFR § 404.1527(d). Perhaps the most notable element that was overlooked by the

ALJ was Dr. Sicotte's specialty. The SSA regulation provides, "Generally, [the SSA] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). The regulations also state, "We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5). Therefore, as Weldon's treating neurologist of more than ten years, Dr. Sicotte, by training and personal experience, was best suited to evaluate Weldon's seizure disorder. Although the ALJ discounted Dr. Sicotte's opinion because she relied on Weldon's self-reporting, the record indicates that Dr. Sicotte also performed medical testing such as EEGs and an MRI.

*Boiles v. Barnhart*, 395 F.3d 421 (7th Cir. 2005) (*Boiles*), is instructive here. In *Boiles*, the Court of Appeals held that the ALJ's decision that the claimant's psuedoseizure disorder did not equal the listed impairment was not supported by the record. Specifically, the court held that the ALJ improperly discounted the treating physician's opinion, which was based on a lack of credentials as a psychologist or psychiatrist and a longitudinal view of the claimant's medical history. *Id.* at 426. Here, the Government argues that the ALJ evaluated Dr. Sicotte's treatment notes in great detail. (Resp. at 4.) However, as discussed above, the ALJ discounted Dr. Sicotte's opinion and instead gave controlling weight to the opinion of the internal medicine physician, Dr. McKenna. Pursuant to *Boiles*, this was improper, particularly in light of Dr. Sicotte's neurosurgery expertise and her longitudinal 10-year view of Weldon's medical history.

Last, in evaluating whether Weldon met the requirements of Listing 11.03, it is not clear whether the ALJ took into account the occurrence of Weldon's auras or solely focused on the occurrence of petit mal seizures. Listing 11.03 requires Weldon to prove "nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, **including all associated phenomena**; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03 (emphasis added). An "aura" is defined as:

> An unusual sensation that is often a warning of an impending migraine headache or a seizure, a sudden episode of uncontrolled electrical activity in the brain, causing a series of involuntary muscle transactions or a temporary lapse of consciousness. An aura may consist of a strange feeling, abnormal perceptions, or visual disturbances such as seeing stars or flashes. For example, preceding the onset of migraine pain, a person may experience a tingling sensation or see zigzagging lights. When it precedes a seizure, an aura may help identify the seizure's focal point in the brain. It is important to diagnose and treat the underlying disorder that is causing the auras.

*Arnold v. Barnhart*, 473 F.3d 816, 818 (7th Cir. 2007) (citing Am. Med. Ass'n, *Complete Medical Encyclopedia*, 210 (Jerrold B. Leinkin & Martin S. Lipsky eds., 2003)). Weldon testified that when she experiences an aura, she will "just sit there and . . . close [her] eyes." (7/17/09 Hr'g Tr. at 28.) Weldon also testified that she can have an aura without having a seizure. (*Id.* (Q. "In other words, you have an aura, and then you may or may not experience a seizure thereafter. Is that correct? A. Yes. . . . Q. And the other day when you had 20 auras in one day, you didn't experience a seizure? A. No.").) Therefore, to the extent the ALJ makes a factual finding, based on the medical evidence, that Weldon's auras are an "associated phenomena" of her seizures under Listing 11.03, the occurrence of auras may be relevant.

11

Based on the ALJ's failure to credit Weldon's treating neurologist's opinions, the ALJ's determination that Weldon's impairment does not meet or equal a listed impairment is not supported by substantial evidence. *See Moss*, 555 F.3d at 560.

The ALJ's determination is not supported by substantial evidence for additional reasons. Weldon argues that the ALJ substituted his independent judgment for that of medical professionals in his determination that Weldon does not meet the requirements of Listing 11.03. It is well established that ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." *Clifford*, 227 F.3d at 870; *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (citing cases). Here, the ALJ reasoned: "[d]ue to advances in treatment, most epileptic seizures are controllable, and most patients who receive appropriate treatment are able to work. . . . When seizures are not under good control, noncompliance with prescribed treatment — rather than ineffectiveness of the prescribed treatment — is the cause." (Op. at 9.) While the ALJ cited to Social Security Ruling (SSR) 87-6, a conclusive application of this ruling to Weldon without regard to her treating physician's opinion is not proper. Dr. Sicotte expressly stated that Weldon had "been tried on multiple medications without ever achieving complete success." Rather than giving at least some weight to Dr. Sicotte's opinion, the ALJ stated, "Because potent anti-epileptic medications are available and reliable methods to analyze therapeutic levels of those medications in patients' bloodstreams, more precise 'tailoring' of drugs to control seizures exists." (Op. at 7 (citing SSR 87-6).) But there is substantial evidence to demonstrate, which the ALJ

12

acknowledges (Op. at 7.), that Dr. Sicotte spent years modifying Weldon's prescription drug regimen in attempts to control her seizure disorder with no success.

Independent medical findings also played a role in the ALJ's decision as reflected in his discussion of Weldon's alcohol consumption. At the first hearing, the ALJ expressed concern regarding Weldon's alcohol consumption and requested that Weldon obtain a report from Dr. Sicotte regarding this issue. Dr. Sicotte submitted a report in which she opined that alcohol consumption and medication compliance were not contributing to the claimant's seizures. In response, the ALJ noted, "This may well reflect that clinician's [Dr. Sicotte's] lack of knowledge about her patient's conduct." (Op. at 9.)

As the fact finder, the ALJ is in the best position to evaluate Weldon's alcohol consumption based on a holistic view of the factual record. Although the Opinion explains that Dr. Brown's treatment notes describe Weldon's alcohol consumption, these treatment notes appear to be from 2005, which is before Weldon alleges the post-surgery onset of disability. However, the ALJ also refers to a 2/27/08 mental health assessment in which Weldon admitted to using alcohol. The next issue is whether Weldon's alcohol consumption (if, when, and to what extent it occurred) has any connection to the frequency of her seizures. At the 7/17/09 hearing, Dr. McKenna explained that **prolonged** alcohol consumption over time that is then stopped can lead to "withdrawal seizures," much like a drug withdrawal situation. (7/17/09 Tr. at 8 (emphasis added).) But a "one time binge drinking on her Friday or Saturday nights, whatever her night is, isn't quite so conducive to withdrawal seizures." (*Id.*) Thus, although Dr. McKenna's

13

testimony indicates that Weldon's alcohol consumption "can precipitate situations that make you very prone to having seizures" and was "highly undesirable," he did not opine that it caused Weldon to have seizures. On this issue, the Government argues that the ALJ did not find that Weldon's seizure frequency increased because of alcohol consumption or non-compliance but rather that these factors undermined Weldon's credibility of her allegations concerning her seizure frequency. (Resp. at 9.) The transcripts and Opinion, however, do not support this argument as the Opinion specifically states that when Weldon experiences seizures, the ALJ is "not convinced that [Weldon] has not abused psychoactive substances." (Op. at 14.)

Weldon further argues that the ALJ's credibility finding is patently wrong. The ALJ's credibility determinations generally will not be overturned unless they were "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Here, the ALJ's credibility finding is cast into doubt insofar as it depended on an erroneous view of the medical evidence and opinions and the ALJ's independent medical findings. Thus there is no need to determine whether the ALJ's credibility finding was patently wrong because the Court has already determined that a remand is necessary. Furthermore, it is worth noting that it is unclear whether the ALJ's finding — that "apparently [Dr. Sicotte] was unaware that [Weldon] had a valid driver's license, and within the next two years, despite reports of treatment compliance and continued, frequent seizures, would renew her driver's license without restrictions" (Op. at 13.) — is supported by the record. Notably, in the 2007 Neuropsychological Evaluation, the doctor noted that Weldon "was driven to the appointment and dropped off as she does not drive." (R. 619.)

## CONCLUSION

For the foregoing reasons, Weldon's Motion for Summary Judgment [17, 18] is granted; Defendant's Motion for Summary Judgment [19, 20] is denied. The ALJ's decision is reversed, and the case is remanded for proceedings consistent with this Opinion.

Date: 8-17-11

JOHN W. DARRAH
United States District Court Judge